THE EMPLOYERS' LIABILITY ASSURANCE CORPORATION, LTD., OF LONDON, ENGLAND, Appellant, *v.* MARY (Also Known as MARIE) WAGNER, Respondent.

First Department, February 26, 1926.

Landlord and tenant — elevators — action by insurance carrier to recover by subrogation under Workmen's Compensation Law against third person for wrongful death of employee — employee was killed by fall down elevator shaft in building owned by defendant — conflicting evidence raised issue on questions whether defendant performed duty of reasonable care in constructing and maintaining elevator and lighting hall — error not to submit said questions to jury.

In an action by an insurance carrier to recover by subrogation under the Workmen's Compensation Law against a third person for the wrongful death of an employee, which was caused by his falling down an open elevator shaft in a

building owned by the defendant when said employee was in the building to repair machinery of a tenant therein, a customer of his employer, in which it appears that the elevator was maintained by the defendant for the use of the tenants in the building, and that the evidence was conflicting as to whether or not the defendant had properly constructed and maintained the elevator, and as to whether she had properly lighted the hall in the building, it was error for the court not to submit said questions to the jury.

APPEAL by the plaintiff, The Employers' Liability Assurance Corporation, Ltd., of London, England, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 26th day of December, 1924, upon the verdict of a jury, and also from an order entered in said clerk's office on the 5th day of January, 1925, denying plaintiff's motion for a new trial made upon the minutes.

This action is by the insurance carrier of an employer to recover by subrogation, under the Workmen's Compensation Law, against a third person for the wrongful death of an employee of the employer.

*Bertrand L. Pettigrew* [*Walter L. Glenney* of counsel], for the appellant.

*Alfred W. Andrews* [*Edward P. Lyon* of counsel], for the respondent.

BURR, J. No. 172 Lorimer street, Brooklyn, the building in which the accident occurred, is a tenant factory building five stories high. It was occupied by many tenants engaged in manufacturing. One of these tenants was the Ideal Shoe Company which had its place of business on the second floor. On the morning of March 5, 1920, Joseph Buadas, an employee of the United Shoe Machinery Corporation of No. 37 Warren street in the borough of Manhattan, was sent to repair some machinery which had been installed by his employer in the said premises of the Ideal Shoe Company. He was later and about ten-thirty o'clock the same morning found in the bottom of an elevator shaft in the Lorimer street building. The door of the elevator opening into the second floor hall, which was the floor on which the Ideal Shoe Company was located, was found partly open, and the collapsible inside gate was open entirely. On the same day and shortly after the accident this collapsible gate, which was constructed with a spring to close automatically when the elevator hoist was not at that floor, was found tied shut with a string. The proof showed that if the spring was broken the gate would stay open.

The defendant was the owner of the building where the accident occurred. A statement as to what happened, made by the deceased before he died, was testified to by a police officer.

The complaint alleged: " Upon information and belief, that the

said Joseph Buadas sustained said injuries which resulted in his death without any fault or carelessness or negligence on his part, but solely through the negligence and carelessness of the defendant, her agents, servants or employees (a) in defendant failing to provide proper and sufficient light in the hallways and stairways of said premises, #172 Lorimer Street, Borough of Brooklyn, City and State of New York, particularly the defendant's failure to provide proper and sufficient light upon the second floor of said building in the immediate vicinity of the said elevator and elevator shaft; (b) in defendant failing to provide and protect by any substantial or sufficient guard, door or gate, the opening of the said elevator at, or on, the second floor of the said building or premises; (c) in failing to have said opening in said elevator shaft closed and protected at said time by any proper or sufficient guard, door or gate; (d) in maintaining said elevator and the shaft in which it ran, and the appurtenances thereto, in a dangerous and negligent manner, without guards, railings, chains, enclosures or protections, and without adequate, proper and sufficient light, all of which was contrary to the law in such cases made and provided and contrary to the laws of the State of New York, the Ordinances of the City of New York, the Rules and Regulations of the Building Department of the City of New York and the Rules of the Board of Standards and Appeals having reference to the construction, maintenance and operation of elevators; (e) in failing to have the door on the second floor of the said premises leading to said elevator shaft locked, bolted or securely fastened on the shaft side; (f) in failing to have a properly constructed door leading from the second floor of said premises to said elevator shaft; (g) and in maintaining said elevator, shaft and appurtenances thereto in a dangerous and negligent manner in that a certain gate leading from the second floor to the said elevator shaft was fastened back so that the shaft was open, also in that the doors leading to the elevator shaft were similar to the doors leading to the lofts, also in that the said gate leading from the second floor to the said shaftway was defective and out of order and had been in such condition for some time prior to the time of the alleged accident to said Joseph Buadas."

The answer interposed by defendant was in the nature of a general denial. The evidence on the trial showed that prior to the 5th day of March, 1920, the day on which he received the injuries from which he subsequently died, Buadas had been employed by the United Shoe Machinery Company for over thirty years. That concern was engaged in the business of manufacturing and selling shoe machinery. Buadas' particular line in that business was instructing operators and repairing machines. He was sent from

the office of his employer on March 5, 1920, to the Ideal Shoe Company at 172 Lorimer street, Brooklyn, to take care of repairs and instruct on machinery which had been supplied by the United Shoe Machinery Company. He was sent at the request of the Ideal Shoe Company. He had been sent to the Ideal Shoe Company's place of business at 172 Lorimer street for the purpose of repairing machinery several times before the 5th of March, 1920. On that morning about ten o'clock, Welk, an employee of a tenant having a place of business on the third floor of 172 Lorimer street, was walking down the stairs, and when he reached the second floor where the Ideal Shoe Company had its place of business, he found the door of the elevator hoist which runs up all the way through about the center of the building from the first to the fifth story partly open, and as he walked past this door he heard a groan, he listened, the door of the elevator was open, there was no gate there and he went down to the first floor. There was no gate there either, he looked down the elevator shaft but could not see anything; he ran down to the engine room and opened the shaftway door there, lit a match and found a man there lying face downward. After turning him over and looking at his face he ran out to the street and notified a policeman. The witness further testified that not only was the door to the elevator shaft open, but there was no gate on the elevator shaft at the floor on which the Ideal Shoe Company was, " because when I put my head through there, if there was a gate there, I couldn't put my head through." There was no gate across the opening when he opened the door and looked into the shaft. " Q. That is, it was entirely open, so that if you stepped off the hall, you would have stepped into the elevator shaft? A. Yes, sir. I put my head right into the elevator shaft, just trying to look down. The only thing I could do was just listen." This witness further testified the lights were not lit on the floor where the Ideal Shoe Company's place was. The entrance to the Ideal Shoe Company was on the same line with the elevator, " but the Ideal Shoe Company door was about three foot or two feet in, see? Now, I should think that you would grab that elevator door before you could see the Ideal Shoe. You might see it if there was light there, but there was not." When questioned as to the door to the elevator shaft, he replied, " It was a door that opened towards you. Q. Opened into the hall? A. Yes, sir." The witness further testified that on other occasions he found that when the door to the elevator was opened it stayed open. There were no springs to keep it shut.

The police officer recognized Welk as the man who had notified him of the accident and testified that in company with Welk he

went to the engine room in the premises and found the injured man there seated in a chair.  He talked with him.  " Q. What did he say?  A. He told me he had gone in the building to call on a shoe concern and had opened the door, and the next thing he knew they picked him up at the bottom of the pit."

Goldzweig, a witness for plaintiff, testified his concern was known as the Ideal Shoe Manufacturing Company, which was at the time of the accident located at 172 Lorimer street on the first floor from the ground, one flight of stairs up.  He sent to the United Shoe Machinery Company for a mechanic to repair his machinery.  This was on the day of the accident.  He testified: " About ten or after ten, I called up the United Shoe Machinery, and I asked them what is the matter  *  *  *  the man doesn't show up  *  *  *  and they told me the man is on the way." Later he went down and saw the ambulance go away.  " Q. Now, at that time when you went down, what was the condition of the lights in the hall on your floor?  A. No lights.  Q. And had such a condition as that ever existed before that?  A. Yes, it did. Q. Very often?  A. Very often."

This witness further testified that after he saw the ambulance drive away that morning he used the elevator.  He found it at the fourth floor and had to pull it down.  The elevator was operated by two ropes, " One rope you have to pull, then it goes up, one rope you have to pull and then it goes down."  On the ground floor he found the door of the elevator did not close and inside the elevator there was a broken gate.  When he came to his floor he " found the door the same way, it does not close; just the same as the other.  Q. What door?  A. The front doors, the iron doors, the two half closed.  *  *  *  Those doors and the gate was tied up when I went to use it.  Q. That is the gate on your floor? A. That is the gate on my floor, on the inside of the shaft.  Q. There was a gate, a collapsible gate, was it?  A. Yes.  Then when I used it, I opened up that piece of string, the gate went back.  *  *  * The Court:  You mean it was shoved to the side and tied there, is that it?  The Witness:  Yes.  I mean, you know when there is an open space, you tie it up.  I mean this is open.  There when you pull it you can't go through there.  Closed means when the gate is together.  *  *  *  It was tied up.  That means closed. *  *  *  The Court:  *  *  *  Was the gate across the opening when you got there?  The Witness:  Yes.  The Court:  And it was tied with a piece of string?  The Witness:  Yes.  Q. At the time when you went up?  A. When I went up.  *  *  *  Q. And you cut the piece of string?  A. Yes.  Q. And that the gate then opened?  A. Yes."  This witness further testified that there were

no lights lit there in the morning. " In the afternoon it was put on big tips on them [gas jets], and there was plenty of light that time. * * * That is what I see in the afternoon. I see big lights."

Defendant called as a witness the son of the owner, who testified that at the time of the accident there were gas jets on each floor, that the doors to the elevator shaft were furnished with springs, the object of which was to have these doors act as self-closing doors. These doors were on all floors except the basement floor. Inside the door of the elevator is a telescope gate. These are collapsible gates, and are on every floor. This collapsible gate behind each door of the elevator closes the opening. " There is a catch which releases a spring, if the elevator gets on the floor, the level of each door, and those doors automatically open, and as the elevator leaves that floor, this catch disengages and they automatically close * * * that is * * * closes the opening." That is true of all floors, except the basement floor. On the basement floor there were two metal doors which were supposed to be closed by heavy springs so that they were self-closing and locking together. There were springs on all these doors. The witness testified he examined them on the morning of the accident and a week prior thereto. There is another entryway to the elevator or hoistway on the second floor besides the door from the hallway. That doorway is entirely on the premises of the Ideal Shoe Company and has nothing to do with the hallway. " There is a horizontal bar across, just like a huge hook and eye, and that hook drops into that hook on the other side."

The witness testified that the conditions he found on the afternoon of the accident were the same as they were when he was there to collect rent four or five days before. On cross-examination this witness admitted that on the very day of the accident work was being done on doors of the elevator shaft by the Eastern District Iron Works. " Q. Part of the work they were doing there was the installing of springs on those doors? A. Not on that [second] floor. Q. In the building, on that shaft? A. Correct; that is right."

Edward J. Brown, inspector of elevators, bureau of buildings, borough of Brooklyn, testified that he inspected the building 172 Lorimer street on February 16, 1920, on which occasion he examined the inclosure of the hatchway on each floor and found the appliances for closing the elevator shaft openings were " iron scissors type, collapsible sliding gate, which was opened manually and closed automatically by a tension spiral spring, which was made permanently fast in the jamb of the door opening at one end, and the other end fastened to half part of the gate. On

opening the door, the tension of the spring was increased and by releasing the door the tension of the spring would automatically close the door. * * * That is, it becomes self-closing because of that spring. * * * Q. What is there to fix that so that you can open it when the elevator comes up? A. On the bottom part of that gate there is a projection on the gate which extends into the hatchway about an inch and a half or two inches, and on the floor of the car there is another extension lever on the floor of the car, so when the car is level with the landing, when you open the gate the car projection engages with the gate projection, and the car being there, holds that gate open automatically. Q. That is, while the car is at the level of the car [floor]? A. While the car is at the level of the floor. When the car moves up or down it releases that holding attachment and the tension of the spring automatically closes the gate. Q. Was that true on each floor in that building? A. That is true on all floors."

The witness further testified that besides this collapsible gate on each floor there was a solid metal door outside on the hallway side of this elevator entrance. That door is provided with a door spring which is hooked on the jamb of the door; that closes the door. " But those doors we did not inspect for safety, because those doors are more for fire protection, and they are supposed to be used in case of fire, or when a factory closes up at nighttime. In all factory buildings the safety of the inclosure is to be guarded inside that door " by the collapsible gates.

This witness further testified that the springs on the collapsible gates, when examined by him on February 16, 1920, were practically new. " The whole entire outfit was a new installation. * * * Q. Did these collapsible gates conform to the rules and regulations of the Building Department? A. Yes, sir."

Defendant called other witnesses who testified that the lights in the hallways, especially as to the second floor, were burning at the time of the accident. One witness, Charles Riehl, testified he saw the gateway and door on the second floor after the accident and they were both closed; that in February of 1920 he put spiral springs on the elevator doors; that he had nothing to do with the collapsible gates. On this particular morning of the accident, March 5, 1920, the witness stated he was putting springs on the metal doors to the elevator on the fourth and fifth floors. " Q. One question with regard to these springs. Were these new springs you were putting in, or were you replacing springs that were already there? A. At what time? Q. On this morning of the accident? A. Replacing springs. Q. Were you taking springs off, and putting other springs on? A. Yes, sir."

This witness testified that he saw the Ideal Shoe Company using the elevator between nine and ten o'clock. " I saw them putting some packages on it, very large." This was before the accident.

The plaintiff called a witness in rebuttal to testify that he had interviewed the witness Riehl on March 19, 1920, and that Riehl then stated that the lighting conditions in 172 Lorimer street at the time of the accident were bad.

At the close of the case the court announced in response to an inquiry by defendant's counsel: " I am going to charge the jury that they cannot find the defendant guilty of any negligence through not having put in the proper door, proper sliding gates, or the proper door or maintained them."

In his charge to the jury the learned trial justice said in reference to the fall of the deceased: " Now, nobody saw him fall; nobody really knows exactly so that he can testify from knowledge how that man fell; and yet you have the duty imposed on you of finding whether or not he fell by the defendant's negligence. There is nothing in the case about his negligence. He is not charged with negligence contributing to the accident. But unless you find some acts of the defendant which was proximate cause, the direct proximate cause of his death, the plaintiff cannot recover. · That is the question of liability in the case, whether you can find such act of negligence or not. There has been much evidence in this case — I am sorry it was necessary to take the time to receive it — because I now have to tell you to reject it. But until we received it, we could not tell to what extent it was available for the purposes of the case. I now refer to the alleged violations of law by the defendant, with respect to an alleged failure to protect this shaft on the second floor by a gate which would automatically close, and thereby automatically prevent the plaintiff from falling, or might be so it tended to do so. The reason I have taken that from you, I might as well explain, although it is not necessary that I should, is because I cannot find that the defendant was lacking in any particular in law; that is, with respect to obeying those rules andpthose laws. Within less than three weeks before the accident, the premises were inspected and gates were found equipped with springs designed for that very purpose of closing the gate, and as nothing is shown as to when they became defective or who was responsible for their being defective, I tell you that you may not charge the defendant with negligence by reason of leaving that gate on the second floor open, or failing to provide proper gates or anything of that. That is out of the case. Now, what remains in the case? The question of lighting. *   *   *

" What time did he fall? Well, nobody knows exactly. He was

groaning when this first witness of the plaintiff found him, I do not mean the first witness in time, I mean the one who testified to hearing him groan. He does not know how long he had been groaning there, how long that door had been opened, how long that gate had been opened. A certain time after that another witness testified that he went up and examined to see what the situation was and he found this collapsible gate on the second floor, that there was a collapsible gate there tied. You will recall what he said and how he said it. I think it is fair to state that his testimony was capable of two constructions. I think that all of us at first thought that he had said the passageway, that the opening from the hall, was open by reason of the fact that the gate was tied.   *   *   * But he ended by saying that the gate was open and tied; that is, that the opening was closed by the extension of the gate, somewhat in the position of the picture here, but tied. Now, what did he mean? Did he mean what he said last, or what some of us thought he said first? Of course, quite different inferences may be drawn from the two things, because if the gate was collapsed so that the opening was there when this witness saw it, perhaps a half an hour or so after the accident, you might infer that that is the same condition in which it was when the deceased fell. On the other hand, of course, if you find that the amount that it was extended and then tied, in view of the position of the gate which goes all the way up and down completely protecting the opening, that means that somebody fastened it after he fell, or so you may infer. So it is important for you to find out, if you can, what he really meant to say."

Plaintiff's counsel duly excepted " to the elimination in your charge of negligence based on the failure of the gate to be closed or to automatically close when the elevator left, as any basis of negligence in the case." And he further stated: " I also except to that part of your Honor's charge which specifies that the only basis of negligence in this case is the lack of light."

" Juror No. 4: I wish to ask a question, Your Honor. The Court: Yes, sir. Juror No. 4: I am a little confused in your statement it is important to determine whether the witness testified that that gate was tied open or shut, having previously stated that the gates were out of the question, and it resolved itself down to the question of light. The Court: I mean bearing on the general situation. Of course, if there had not been something there for him to fall down from, he could not have fallen. Where did he fall? You see, it might indicate where he fell, according as to how you construe the testimony of that witness, might it not? I am simply, without taking sides at all, trying to give you

gentlemen a chance to look at all sides of this case, under the rules I have laid down. You may retire."

The court thus removed from the consideration of the jury the question whether the landlord had used reasonable care in the construction and maintenance of the elevator, or whether he had been guilty of any negligence in respect thereto which caused or contributed to cause the death of the deceased.

It is clear from the evidence in this case that the landlord supplied to the tenants of this building for their use the elevator in question. The landlord did not supply an operator. The tenants operated it and used it as they needed its use. Instead of carrying the materials they needed in their business up or down the stairs, the landlord supplied the elevator so that they could thereby carry up or bring down such materials. It was his duty to use reasonable care in the construction and maintenance of this elevator, to see that it was reasonably safe for the purpose for which it was used, and that the elevator shaft was protected by substantial and sufficient guard, door or gate to prevent any one from falling into the shaft. This duty the landlord owed not only to the tenants but also to those who had business with the tenants and were lawfully on the premises. The jury might have found that the proper performance of this duty required the landlord to see that the entrance to the elevator shaft on each floor was properly protected by a door and a gate which would shut and remain shut while the elevator hoist was either above or below the particular floor. There was sufficient evidence in the case to warrant the inference that the deceased met his death by falling down the open and unprotected elevator shaft from the second floor while on the premises to perform the work assigned to him, to wit, to go to the Ideal Shoe Manufacturing Company's place of business on the second floor and repair the machinery which had been installed there by his employer. The open door of the elevator shaft and the open elevator gate found on that floor when he was found at the bottom of the shaft, as well as the lack of light on the second floor, coupled with the fact testified to that the elevator doors were not in proper working order at and before the time in question, raised a question of fact as to whether the landlord had used reasonable care in the construction and maintenance of the elevator. There was a conflict of evidence as to the condition of the elevator shaft door and the elevator gate at the time of the accident, as well as to whether there was sufficient or any light on the second floor. The jury should have been permitted to pass on both questions. The admitted fact that on the day of the accident new springs were being placed on the elevator doors tended to show

knowledge on the part of the landlord that the springs of the elevator doors were out of order prior to the accident and is inconsistent with and tends to contradict the testimony of the son of the owner and also the testimony of the building department inspector, the testimony of the latter being substantially that on February 16, 1920, less than three weeks before the accident, all the doors and gates of the elevator shaft throughout the building were in perfect condition, were in fact a practically new installation. There was a *prima facie* case of negligence made out against the defendant. While it has been recently held that the rules and regulations governing passenger elevators do not apply to freight elevators (*Sarconi* v. *122 West 26th Street Corp.*, 241 N. Y. 340), in the instant case the doors, gates and shaft of the elevator were admittedly furnished by and were within the control of the defendant, and upon the evidence presented in the case it was for the jury to say whether the defendant had used reasonable care in the construction and maintenance of the elevator doors, gates and shaft. That, irrespective of such rules, is the measure of the landlord's duty. (*Grifhahn* v. *Kreizer*, 62 App. Div. 413; affd., without opinion, 171 N. Y. 661.) That duty he owed to the deceased who was lawfully upon the premises. (*Sciolaro* v. *Asch*, 198 N. Y. 77; *Besner* v. *Central Trust Co.*, 230 id. 357.) To take this issue from the jury was prejudicial to the rights of the plaintiff and constituted error which necessitates reversal.

The judgment and order appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event.

FINCH and MARTIN, JJ., concur; CLARKE, P. J., and MERRELL, J., concur in result.

Judgment and order reversed and new trial ordered, with costs to appellant to abide the event.